# 𝔖taunton

LONDON GUARANTEE & ACCIDENT COMPANY, LTD. V.
C. B. WHITE AND BROS., INC.

September 8, 1948.

Record No. 3356.

Present, Hudgins, C. J., and Eggleston, Buchanan, Staples and Miller, JJ.

*Eastwood D. Herbert*, for the plaintiff in error.

*Rixey & Rixey*, for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

The defendant below, London Guarantee & Accident Company, Ltd., herein referred to as defendant or insurance company, issued its policy of liability insurance to C. B. White and Bros., Inc., plaintiff below, herein referred to as plaintiff or insured, covering a dump truck used by the plaintiff in its business of retail coal dealer in Norfolk.

While plaintiff was delivering coal to a customer, under

the circumstances to be related, a Mrs. Gurganus was injured by falling over a lump of coal on the sidewalk. She brought suit against plaintiff for damages, which the insurance company refused to defend. It was settled at a cost to plaintiff of $613.50. Plaintiff thereupon brought this suit against the insurance company for reimbursement and recovered a judgment for said amount. Its right to that judgment is the question at issue on this appeal.

The trial court instructed the jury that there was an obligation on the insurance company under the policy to defend the action brought by Mrs. Gurganus. The parties stipulated that if there was anything due the plaintiff, the whole amount of $613.50 was due. We are, therefore, not concerned with the amount of the verdict or its items.

By the policy, in "Coverage A," the insurance company contracted, among other things, to pay all damages for which the insured is made liable by law for bodily injury sustained by any person caused by accident and arising out of the ownership, maintenance or use of the truck. Use of the truck was stated to be "commercial," which was defined as use principally in the business occupation of the insured (coal and fuel dealer), including "the loading and unloading thereof."

The policy further provided that "as respects such insurance as is afforded by the other terms of this policy" under Coverage A, the company shall defend "any suit against the insured alleging such injury * * * and seeking damages on account thereof, even if such suit is groundless, false or fraudulent."

The notice of motion in the suit of Mrs. Gurganus, after amendment, alleged that the insured and its co-defendant, Old Dominion Paper Company, negligently threw or placed lumps of coal on the sidewalk, "said coal having been unloaded upon the said *sidewalks*, in violation of the ordinances of the City of Norfolk by C. B. White and Brothers, Incorporated, from a truck or trucks owned, operated and controlled by said C. B. White and Brothers, Incorporated, which coal was ordered to be unloaded at

said place by the Old Dominion Paper Company," and that the defendants negligently permitted said lumps of coal to remain on the sidewalk and failed to give warning thereof, thereby rendering said sidewalk unsafe for pedestrians.

The insurance company argues that in order for it to be required to defend that suit, it was necessary that the notice of motion allege facts which brought the case within the terms of the policy, and that it did not do so. On the other hand, the plaintiff asserts that the basis of liability stated by the notice, "in part at least," is the negligence of the plaintiff "in the act of unloading the coal on the sidewalk;" and that consequently there was an obligation to defend, regardless of the merits of the suit or the truth of the statement in the notice.

We agree that the insurance policy cast upon the defendant the duty to defend, initially at least, only if the suit against its insured stated a case covered by the policy. So we have held and so it seems to be generally held.

In *Ocean Acci., etc., Corp.* v. *Washington Brick, etc., Co.,* 148 Va. 829, 139 S. E. 513, a clause was considered likewise making it the duty of the insurance company to defend any suits against its insured, although "wholly groundless, false or fraudulent." It was contended there that the insurance company was bound by the terms of its policy to defend all suits. But it was held that it would be illogical to say that this provision concerning the obligation to defend was intended to bind the insurer to defend a suit in which, under the terms of the policy, it had no interest; that this language of the policy must be read in connection with the fundamental contractual obligation appearing upon the face of the contract between the parties, which was that the insurer would indemnify the insured only in case of recovery of damages by employees legally employed. It was said:

* * * "In our opinion the only reasonable construction of the policy here is that the insurer was under no obligation to defend the case against the insured when it would not be liable under its contract for any recovery therein

had. On the contrary, it should refrain from interfering in any way with the insured in respect to its defense of the case." (148 Va. 844, 139 S. E. 517).

*Cf. Maryland Cas. Co.* v. *Cole*, 156 Va. 707, 158 S. E. 873, in which the basis of the action was the failure of the insurer to defend, under a policy which the record on file shows bound the insurer to "investigate all accidents and claims covered hereunder, and defend in the name and on behalf of the Assured all suits thereon, even if groundless, * * *."

In *Fessenden School* v. *American Mut. Liability Ins. Co.*, 289 Mass. 124, 193 N. E. 558, 561, it was said:

* * * "We think the contention of the defendant is sound, that the obligation of the defendant insurance company is to be determined by the allegations of the declaration and it is not required to defend if it would not be held bound to indemnify the defendant in the action if the plaintiff prevailed upon the allegations of the declaration. * * *." Citing *Ocean Acci., etc., Corp.* v. *Washington Brick, etc., Co., supra*, and many other cases.

See also, *Brodek* v. *Indemnity Ins. Co.*, 292 Ill. App. 363, 11 N. E. (2d) 228; *Luchte* v. *State Auto. Mut. Ins. Co.*, 50 Ohio App. 5, 197 N. E. 421; *Daniel* v. *State Farm Mut. Ins. Co.*, 233 Mo. App. 1081, 130 S. W. (2d) 244; *Duval* v. *Aetna Cas., etc., Co.*, 304 Mich. 397, 8 N. W. (2d) 112.

When we look to the notice of Mrs. Gurganus, it is at least uncertain whether it alleges a case covered by the policy. It alleges that the piece of coal stumbled over was one "having been unloaded," a past transaction; and which "was ordered to be unloaded at said place by the Old Dominion Paper Company." The time of unloading and the place of unloading are two vital elements in the question of liability under the policy, and the allegations of the notice are not such as to be conclusive upon the question, as we shall show.

While the duty to defend is, in the first instance, to be determined by the allegations of the notice of motion, yet if those allegations leave it in doubt whether the case alleged

is covered by the policy, the refusal of the insurance company to defend is at its own risk; and if it turns out on development of the facts that the case is covered by the policy, the insurance company is necessarily liable for breach of its covenant to defend. The defendant admits that to be true and states in its brief that "if this Court upholds the lower court in extending coverage of the policy to the facts of this case, then the defendant is liable for the agreed damages."

The evidence shows that the plaintiff had contracted to deliver the coal that was being hauled by this truck to its customer, Old Dominion Paper Company, in the bin under the customer's store. Access to this bin was through a manhole in the sidewalk in front of the store, located 4 feet 8 inches from the front of the building and 13 feet 10 inches from the curb. The first load of the order had been delivered by a conveyor truck, not covered by the policy. This method would not work, so the balance was being delivered by the dump truck. Two employees of the plaintiff went with the conveyor truck and remained at the store to handle the coal from the dump truck into the customer's bin. No coal had been left on the sidewalk from the conveyor truck. The dump truck dumped its load at the edge of the curb and from there the two employees shoveled it into the manhole. They were thus engaged when Mrs. Gurganus came along walking between the store and the manhole. She tripped, or in some manner fell over a piece of the coal and was injured. The truck was then about 100 feet away from the dumping place, returning to its loading place for another load of the coal to be delivered.

The sidewalk sloped from the building to the curb and one of plaintiff's men, who was shoveling the coal, testified that none of the coal rolled on the sidewalk when it was dumped. The necessary inference is that the piece of coal which caused Mrs. Gurganus to fall was there as a result of shoveling the load of coal, which had been dumped by the truck, from the curb through the manhole into the bin where the plaintiff had contracted to deliver it.

There are two theories in regard to liability under the "loading and unloading" clause of the policy in judgment. One is called the "coming to rest" doctrine. Under this doctrine "unloading" is given a narrow construction and is held to extend only to the actual lifting of the article from the motor vehicle to a place of rest outside the vehicle, and the connection of the vehicle with the process of unloading has ceased. A leading case adopting this theory is *Stammer* v. *Kitzmiller*, 226 Wis. 348, 276 N. W. 629. There a pedestrian fell into a manhole in the sidewalk which had been left open by an employee of a brewery company, who was using one of its trucks to deliver beer to a tavern. He parked the truck at the curb, opened the manhole, removed a barrel of beer from the truck, and put it through the manhole, which he left unguarded while he went inside the tavern to have a sales slip signed. It was held that the insurance company was not liable under the loading and unloading provision of its contract, on the ground that * * * "The stipulation to pay all losses and expenses imposed by law under the clause quoted does not carry the liability of the insurer beyond what may be described as the natural territorial limits of an automobile and the process of loading and unloading it. When the goods have been taken off the automobile and have actually come to rest, when the automobile itself is no longer connected with the process of unloading, and when the material which has been unloaded from the automobile has plainly started on its course to be delivered by other power and forces independent of the automobile and the actual method of unloading, the automobile then may be said to be no longer in use. * * *." (276 N. W. 631).

The other theory of liability is called the "complete operation" doctrine. It gives to the "loading and unloading" clause a broader construction and interprets it to cover, as respects unloading, the entire process of transportation to the point where the goods are turned over to the party for whom intended at the agreed place of delivery.

A leading case applying this rule is *State* v. *District Court*, 110 Mont. 250, 100 P. (2d) 932. There a brewing company was engaged in delivering a barrel of beer into the basement of a customer through a hinged door in the sidewalk. The beer had been taken from the truck and placed on the sidewalk; the servant of the company then entered the customer's place of business, proceeded to the basement and lifted the door in the sidewalk just as a pedestrian stepped on it. It was held that the accident was covered by the insurance policy, the court saying:

"We hold that under the facts here presented the unloading of the truck was a continuous operation from the time the truck came to a stop and the transportation ceased until the barrel of beer was delivered to the customer. The unloading of the truck cannot be said to have been accomplished when the barrel of beer was placed upon the sidewalk. As well might it be argued that the loading of the truck consisted merely of the act of lifting commodities from the ground to the body of the truck. The loading of the truck would contemplate much more than that. It would embrace the entire process of moving the commodities from their accustomed place of storage or the place from which they were being delivered until they had been placed on the truck. So, too, the unloading thereof embraced the continuous act of placing the commodities where they were intended to be actually delivered by use of the truck. This being so, the insurance company policy has application. * * *." (100 P. (2d) 934-35).

In *Wheeler* v. *London Guarantee, etc., Co.*, 292 Pa. 156, 140 A. 855, the insured had contracted to deliver steel girders inside of a garage building where they were to be used. The girders had been unloaded from the truck and the truck was standing across the street when a boy was hurt in attempting to climb over one of the girders, which was extending on to the sidewalk. The insurer declined to defend but it was held that the accident was covered by its policy, which contained the usual loading and unloading provision. The court said:

* * * "Unquestionably at the time of the accident plaintiffs were actually engaged in the transportation and delivery of merchandise and materials incidental to their business. The process of the transportation was commenced by loading at the factory the two steel girders on the truck and trailer, both insured under the policy, and was to be completed by delivery of the girders upon a space within the garage building. We think no reference to authorities or decisions is required to support here the elemental principle that this particular instance of transportation and delivery could not be completed, in the absence of direct or implied orders or directions to the contrary, until the merchandise was unloaded and delivered from the truck and trailer inside the garage building where intended for use, * * *." (140 A. 856).

In *Pacific Auto. Ins. Co.* v. *Commercial Cas. Ins. Co.*, 108 Utah 500, 161 P. (2d) 423, 160 A. L. R. 1251, employees of a brewery company were delivering beer to a restaurant. They parked the insured truck at the curb, took the kegs of beer off and placed them on the sidewalk. One of the employees then went through the building and opened a manhole in the sidewalk and was taking the beer into the basement, where it was to be delivered. A blind man came along and fell into the manhole and the question involved was whether the lowering of the kegs into the basement was a part of the process of unloading the truck. It was held that it was, the court saying:

* * * "Practically all authorities are agreed that in such insurance contracts the phrase 'including loading and unloading' is a phrase of extension. It expands the expression 'the use of the truck' somewhat beyond its connotation otherwise so as to bring within the policy some acts in which the truck does not itself play any part. * * *." (160 A. L. R. 1253).

"The necessary causal relationship between the use of the truck and the accident is apparent in the fact that the accident occurred in the course of making a commercial

delivery in which delivery the use of the truck was an active factor or element.

"We conclude that the proper rule of construction of policies such as here involved is that the mission, or transaction, or function being performed by the insured's employees at the time of the accident is the controlling element in determining whether the situation from which the accident occurred is included in loading and unloading. The job being performed here, that part of the insured's business functioning at the time of the accident was that of making a proper commercial delivery. * * * *, which was the purpose for which, and the field over which the policy of plaintiff was written, * * *." (*Idem*, p. 1258).

This case reviews a number of cases and discusses the divergent views. Appended to it in 160 A. L. R., beginning at page 1259, is a comprehensive note discussing the two doctrines and related questions under the "loading and unloading" clause, and many cases dealing with the subject.[1]

We hold that the "complete operation" doctrine should be adopted and applied to the case in judgment as better effecting the purpose of the policy and in keeping with the common understanding of its terms.

■ * * * "The whole document should be construed in the light of the subject matter with which the parties are dealing and the words or phrases of the policy should be given their natural and ordinary meaning as understood in the business world. *Maryland Cas. Co.* v. *Cassetty*, 6 Cir., 119 F. (2d) 602, 603-4.[2]

---

[1] For additional discussion and citation of cases on the subject, see article at page 21 of the Spring issue, 1948, of "The Lawyer and Law Notes." The author refers to the "complete operation" rule as the modern doctrine and states that the modern trend seems to be to afford the insured complete protection and to hold that the loading and unloading clause "covers the entire process involved in the movement of goods from the moment when they are given into insured's possession until they are turned over to or delivered at their destination."

[2] This was a case construing an identical policy and holding the insurer liable where a pedestrian stumbled over a lump of coal from a pile which had been dumped from a truck and was being shoveled down a manhole into the basement where it was to be delivered. At the time of the acci-

Here the subject matter was a dump truck to be used in the business occupation of the plaintiff. That occupation was the sale and delivery of coal. Delivery could not be made without unloading the truck, and that process, in addition to the *use* of the truck, was specifically covered by the policy.

Neither could the business of delivering coal be accomplished by unloading the coal on the street or sidewalk. It would be of no use to the customer there, and the plaintiff's contract was to deliver it into the bin of the customer. Not only was that the plaintiff's contract in this case, but the evidence affirmatively shows that was its practice and contract in all of its sales. It is to be presumed that the insurance company knew the character of the plaintiff's business in which the truck was to be used. The policy of insurance specified that the truck was to be used in that business, and to emphasize that coverage, it specified it was to include unloading. Under the plaintiff's contract in this instance and its practice and contract in all instances, the unloading was not completed until the coal was unloaded into the bin in the basement.

dent the truck was about a block away. Practically the only difference between that case and this is that the accident occurred after the coal was unloaded but before the shoveling process began.

See also, *Maryland Cas. Co.* v. *Tighe,* 9 Cir., 115 F. (2d) 297, in which the insured truck was being used to deliver vegetables to a restaurant. The truck was parked on the opposite side of the street from the restaurant. The servant of the insured carried vegetables across the street and delivered them; he then started back to the truck for more vegetables to deliver when he collided with and injured a pedestrian. The court found that at the time of the accident the servant was unloading the truck and the accident was therefore within the coverage of the policy.

In *B. & D. Motor Lines, Inc.* v. *Citizens Cas. Co.,* 43 N. Y. S. (2d) 486, (affirmed 48 N. Y. S. (2d) 472; leave to appeal denied, 49 N. Y. S. (2d) 274), the truck was sent to deliver cartons; the driver and helper unloaded them from the truck on to a hand conveyor, which was then pushed 30 feet to the entrance of the building, then 18 feet or more into the building, where it collided with a pedestrian. It was held the accident occurred before delivery was complete. "Unloading continues * * * until delivery is effected, and is a 'use' of the truck within the meaning of the policy." (43 N. Y. S. (2d) 489-90).

See also, *Krasilovsky Bros. Truck Corp.* v. *Maryland Cas. Co.,* 54 N. Y. S. (2d) 60.

If the lump of coal that caused the accident had been shoveled from the truck, very clearly the policy would have covered the accident, even under the "coming to rest" doctrine, as we understand the scope of that doctrine. We are unable to discern the logic of holding that there was no coverage if, instead of shoveling the coal from the truck, it was first dumped from the truck and then shoveled into the manhole. The act of shoveling was not an act separate from and independent of the use of the truck, but a step attached to its use and necessary to accomplish the purpose for which the truck was being used.

The ultimate purpose was to deliver the coal into the bin, and the policy stated it was to cover the unloading of the truck in its use for that purpose. Only by the shoveling could the mission of the truck be accomplished and its use be made effective. The shoveling was an integral part of the unloading process, and we perceive no sound reason for excepting it from the coverage of the policy.

The judgment complained of is

*Affirmed.*